Morton LEVINE, Plaintiff Below, Appellant,

v.

Roger B. SMITH, James F. McDonald, Howard H. Kehrl, F. Alan Smith, Donald J. Atwood, Lloyd E. Reuss, Robert C. Stempel, Thomas A. Murphy, Anne L. Armstrong, Catherine B. Cleary, James H. Evans, Walter A. Fallon, Charles T. Fisher, Marvin L. Goldberger, John J. Horan, Edmund T. Pratt, Jr., James D. Robinson, III, John G. Smale, Leon H. Sullivan, Dennis Weatherstone, Thomas H. Wyman, H. Ross Perot, Morton H. Meyerson, J. Thomas Walter, Jr., William K. Gayden, Defendants Below, Appellees,

and

General Motors Corporation, Nominal Defendant Below, Appellee.

David GROBOW, Shelley Kostrinsky, Joyce L. Thomas, Drexel Home, Inc., Adelle Brody, Jerrold Schaffer, Phyllis Greenfogel, Martin Besen, Joseph Lieberman, Blanche Silverberg, Irving Kas, Beatrice L. Russ and Bronson Murray, Plaintiffs Below, Appellants, and Cross–Appellees,

v.

H. Ross PEROT, Roger B. Smith, James F. McDonald, Howard H. Kehrl, F. Alan Smith, Donald J. Atwood, Lloyd E. Reuss, Robert C. Stempel, Thomas A. Murphy, Anne L. Armstrong, Catherine B. Cleary, James H. Evans, Walter A.

Fallon, Charles T. Fisher, Marvin L. Goldberger, John J. Horan, Edmund T. Pratt, Jr., James D. Robinson, III, John G. Smale, Leon H. Sullivan, Dennis Weatherstone, Thomas H. Wyman, Morton H. Meyerson, J. Thomas Walter, Jr., and William K. Gayden, Defendants Below, Appellees, and Cross–Appellants,

and

General Motors Corporation and Electronic Data Systems Corporation, Nominal Defendants Below, Appellees, and Cross–Appellants.

Supreme Court of Delaware.

Submitted: Oct. 3, 1990.

Decided: April 9, 1991.

Revised Following Motion for Reargument: May 1, 1991.*

* The opinion dated April 9, 1991 is withdrawn; this revised opinion is substituted in its place.

Curtis V. Trinko (argued), pro hac vice (Kevin J. Yourman, New York City, of counsel), John M. Bader of Tomar, Seliger, Simonoff, Adourian & O'Brien, Wilmington (James J. Koehler and John J. Hill of Gallagher, Sharp, Fulton & Norman, Cleveland, Ohio, of counsel), for plaintiff below, appellant Morton Levine.

Dennis J. Block (argued), pro hac vice, Irwin H. Warren, Stephen A. Radin and Jacqueline Abramson of Weil, Gotshal &

Manges, New York City, E. Norman Veasey and Thomas A. Beck of Richards, Layton & Finger, Wilmington, for defendants below, appellees Anne L. Armstrong, Catherine B. Cleary, James H. Evans, Walter A. Fallon, Charles T. Fischer, III, Marvin L. Goldberger, John J. Horan, Howard H. Kehrl, Thomas A. Murphy, Edmund T. Pratt, Jr., James D. Robinson, III, John G. Smale, Leon H. Sullivan, Dennis Weatherstone, Thomas H. Wyman and General Motors Corp. Director.

Lowell E. Sachnoff (argued), pro hac vice, of Sachnoff & Weaver, Ltd., Chicago, Ill., Kevin Gross of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiffs below-appellants and cross-appellees David Grobow, Shelley Kostrinsky, Joyce L. Thomas, Drexel Home, Inc., Adelle Brody, Jerrold Schaffer, Phyllis Greenfogel, Martin Besen, Joseph Lieberman, Blanche Silverberg, Irving Kas, Beatrice L. Russ and Bronson Murray.

William O. LaMotte, III and Thomas Reed Hunt, Jr. of Morris, Nichols, Arsht & Tunnell, Wilmington, Stephen C. Neal, Robert J. Kopecky and Helen E. Witt of Kirkland & Ellis, Chicago, Ill., for nominal defendants below, appellees General Motors Corp. and Electronic Data Systems Corp.

Grover C. Brown, Barbara McDonald and Lewis H. Lazarus of Morris, James, Hitchens & Williams, Wilmington, Roy L. Reardon and Joseph F. Tringali of Simpson, Thacher & Bartlett, New York City, for defendants below, appellees Donald J. Atwood, James F. McDonald, Lloyd E. Reuss, F. Alan Smith, Roger B. Smith and Robert C. Stempel.

Bruce M. Stargatt and David C. McBride of Young, Conaway, Stargatt & Taylor, Wilmington (Thomas D. Barr, Evan R. Chesler, Thomas G. Rafferty and Bernardo Burstein of Cravath, Swaine & Moore, New York City, of counsel), for defendant below, appellee, and cross-appellant H. Ross Perot.

Michael J. Basford and Louis H. Lindeman, Jr., General Motors Corp., Detroit, Mich., of counsel, for defendant General Motors Corp.

Before HORSEY and MOORE, JJ., and TAYLOR, Judge (sitting by designation pursuant to Del. Const. Art. 4 § 12).

HORSEY, Justice:

These separate shareholder suits, consolidated on appeal, challenge once again the business judgment rule's application to action of the General Motors Board of Directors which this Court addressed three years ago in *Grobow v. Perot*, Del.Supr., 539 A.2d 180 (1988) (hereinafter *"Grobow I"*). The appeals highlight the differing legal standards controlling shareholder standing to pursue derivative claims depending on whether the shareholder asserts a claim of demand futility or wrongful refusal of demand. In the *Grobow* appeal (hereinafter *"Grobow II"*), a derivative claim premised on futility of demand, the Grobow plaintiffs again contend that they have now met their burden of pleading, by their "Second Amended Complaint," particularized facts sufficient to excuse demand. Concurrently, shareholder Morton Levine, appealing the Court of Chancery's dismissal of his original suit, contends that his Amended Complaint pleads particularized facts sufficient to create a reasonable doubt that the General Motors directors wrongly refused Levine's presuit demand.

In *Grobow II*, we hold that plaintiffs' restated complaint fails to state a claim of demand futility. The Second Amended Complaint fails to plead with particularity facts which would raise a reasonable doubt of director disinterest and independence or that the challenged transaction was otherwise the product of a valid exercise of business judgment. *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 814 (1984).

In *Levine*, we hold that the Amended Complaint fails to allege particularized facts sufficient to create a reasonable doubt that the General Motors outside directors were either manipulated or misled by management or were so uninformed as to fail to exercise due care. We reaffirm the rule that on a Court of Chancery Rule 23.1 motion to dismiss a derivative suit in a case of demand refused, director indepen-

dence and lack of self-interest is conceded. Therefore, the trial court reviews the board's decision only for compliance with the traditional business judgment rule. The only relevant question is whether the directors acted in an informed manner and with due care, in a good faith belief that their action was in the best interest of the corporation.

## I. FACTS

Each of these derivative suits challenges General Motors Corporation's ("GM") repurchase on December 1, 1986 from H. Ross Perot, then GM's largest shareholder, of all his GM Class E stock and contingent notes and those of Perot's close associates of Electronic Data Systems Corporation ("EDS"), a wholly owned GM subsidiary. The facts underlying this transaction have been previously set forth at length in this Court's Opinion in *Grobow I* and in the reported decision of the Court of Chancery from which the *Grobow I* appeal was taken. *Grobow v. Perot*, Del.Ch., 526 A.2d 914 (1987), *aff'd*, *Grobow I*, 539 A.2d at 180. Therefore, we recite those facts only in a summary fashion, including such other facts as are pertinent to these consolidated appeals.

Both derivative actions are brought on behalf of GM and GM's wholly owned subsidiary, EDS, which was founded by Perot. The named defendants in both actions are all twenty-one members of GM's Board of Directors, Perot, and three of Perot's close EDS associates. In 1984, GM acquired by merger 100 percent of EDS' stock. By the terms of the merger, Perot, then EDS' chairman and largest shareholder, exchanged EDS stock for cash, GM Class E stock and a contingent note package. The transaction made Perot GM's largest shareholder with 0.8 percent of GM voting stock. Perot remained chairman of EDS and became a member of the GM Board of Directors. GM and EDS agreed that EDS, although a wholly owned subsidiary of GM, would be allowed to operate with a "substantial degree of autonomy" and would retain "significant control over its internal affairs."

While the GM–EDS merger proved to be largely successful, numerous disputes arose between GM and Perot regarding the management and operation of EDS. By mid–1986, Perot became increasingly critical of GM management concerning issues involving EDS and unrelated to EDS, including the quality of GM products. Perot's criticism received wide media attention, with Perot being quoted in *Business Week* as having criticized GM for "producing second-rate cars." Perot also believed that GM was not acting in accordance with agreements the parties had reached. By the summer of 1986, Perot made demands upon GM's chairman that GM either buy him out or else allow him to operate EDS as he saw fit. Perot also threatened to sue GM.

In the fall of 1986, GM and Perot entered into negotiations for GM to repurchase Perot's interest in GM. This followed an aborted effort by GM to sell EDS to American Telephone and Telegraph. By November 30, 1986, the terms of a definitive agreement had been reached; and on that date, the Oversight Subcommittee of the GM Board's Audit Committee met to discuss the proposed agreement. The members of the three-person Subcommittee were all outside, non-management directors. Other directors participated in the lengthy meeting, although the full Board was not present. The Oversight Subcommittee unanimously recommended that the GM Board approve the terms of the repurchase. At the time, GM's twenty-one member Board consisted of but seven inside, or management, directors and fourteen outside directors, excluding Perot. The next day, December 1, the full GM Board (excluding Perot) met and unanimously approved the transaction.

Under the terms of the repurchase transaction, GM purchased all of the GM Class E stock and contingent notes of Perot and Perot's three close EDS associates for $61.90 per share, including the note package, for a total sum of roughly $742.8 million. Part of the consideration received by GM included Perot's agreement: not to compete with EDS for three years; not to

recruit EDS executives for eighteen months; not to acquire GM stock or engage in a proxy contest for five years; and to refrain from further criticism of GM management.

## The Grobow Suit

In December 1986, GM shareholders, Grobow and others (hereinafter "the Grobow plaintiffs"), filed three separate derivative actions (later consolidated) against GM, EDS, GM's directors, Perot, and three of Perot's EDS associates. As noted above, the suits attacked GM's December 1, 1986 repurchase transaction. All defendants moved to dismiss the action on the ground that the Grobow plaintiffs had failed to comply with Court of Chancery Rule 23.1 because they neither made a prelitigation demand on GM's Board nor pleaded particularized facts demonstrating that such a demand was excused as futile. Following briefing and oral argument, and before decision on defendants' motion to dismiss, plaintiffs filed an Amended Complaint. Following defendants' renewal of their motion to dismiss and further briefing, the Court of Chancery granted defendants' motion and entered judgment dismissing the action on April 13, 1987. *Grobow*, 526 A.2d at 914. Plaintiffs appealed to this Court, and this Court, on March 15, 1988, affirmed the decision below. *Grobow I*, 539 A.2d at 180.

Within two months, on May 16, 1988, the Grobow plaintiffs moved the Court of Chancery under Rules 60(b)(2) and 15(a) to vacate the *Grobow I* judgment and for leave to file a second amended complaint on the basis of newly discovered evidence. The newly discovered evidence consisted of the depositions of two of GM's outside directors obtained in May or June 1987 in a related New York action, and a book published in early 1988 titled *Call Me Roger*. The Court of Chancery granted in part plaintiffs' motion on January 9, 1989, and plaintiffs then filed a Second Amended Complaint. The Court of Chancery, by decision dated January 2, 1990, granted defendants' renewed Rule 23.1 motion and dismissed the Second Amended Complaint. When the Grobow plaintiffs filed the present appeal, defendants filed cross-appeals from the trial court's January 9, 1989 order granting plaintiffs Rule 60(b) relief and leave to file a second amended complaint.

## The Levine Suit

On December 11, 1986, ten days after the GM Board's approval of the Perot repurchase agreement, GM shareholder Levine made written demand upon the GM Board to rescind the Perot repurchase transaction. Levine also requested that the Board allow him to appear and speak in support of his position at its next meeting. Although the Board promised to consider the demand at its next regularly scheduled meeting, it did not hear from Levine in person. On January 5, 1987, the GM Board met and voted unanimously to reject demand. GM notified Levine's counsel on January 9, 1987 that the Board had reviewed the December 11 demand letter and had unanimously decided that legal action would not be "in the best interests of the Corporation." On February 3, 1987, Levine filed suit in the Court of Chancery; and two months later, the court issued its ruling dismissing the *Grobow I* suit.

When Levine initiated discovery, GM and its directors moved to dismiss the complaint under Rule 23.1 and for a protective order pending disposition of the motion. Following briefing, limited to defendants' motion for a protective order, the Court of Chancery, in December 1987, granted defendants' motion and stayed further discovery. Following defendants' briefing of their motion to dismiss under Rule 23.1, Levine filed on January 26, 1988 an Amended Complaint; and defendants renewed their motion to dismiss. On November 27, 1989, the Court of Chancery granted defendants' motion and dismissed the Levine Amended Complaint. Levine then docketed this appeal on December 21, 1989, after the trial court denied Levine's request to file a second amended complaint.

## Related Federal Litigation

Other GM shareholders filed ten federal court actions challenging the December 1,

1986 repurchase transaction for violations of federal securities law and for wrongful refusal of demand. After consolidation of the cases, which include class and derivative claims, and transfer to the District of Delaware, the court dismissed the class claims on September 7, 1988 but declined to dismiss the derivative claims. The court found that plaintiffs had adequately pleaded wrongful refusal of demand. *In re General Motors Class E Stock Buyout Sec. Litigation*, 694 F.Supp. 1119, 1133–34 (D.Del.1988) (motion for reargument pending and proceedings stayed). The GM defendants moved for reargument, and the case was later reassigned to another judge, who stayed consideration of reargument pending this Court's decision in this appeal.

## II

### A

#### Demand Requirements of Rule 23.1

A shareholder derivative suit is a uniquely equitable remedy in which a shareholder asserts on behalf of a corporation a claim belonging not to the shareholder, but to the corporation. *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 811 (1984). Under Delaware law, a derivative suit is also a qualified or conditional remedy by reason of its "potential for conflict between the directors' power to manage the corporation and the shareholders' power to sue derivatively." *Kaplan v. Peat, Marwick, Mitchell & Co.*, Del.Supr., 540 A.2d 726, 730 (1988); 8 *Del.C.* § 141(a). The directors of a corporation and not its shareholders manage the business and affairs of the corporation, *Paramount Communications, Inc. v. Time, Inc.*, Del.Supr., 571 A.2d 1140, 1150 (1990), and accordingly, the directors are responsible for deciding whether to engage in derivative litigation. *Zapata Corp. v. Maldonado*, Del.Supr., 430 A.2d 779, 782 (1981). "The decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation." *Spiegel v. Buntrock*, Del. Supr., 571 A.2d 767, 773 (1990). On the other hand, the directors' exercise of their managerial power in all its aspects "is tempered by fundamental fiduciary obligations owed by the directors to the corporation and its shareholders." *Kaplan v. Peat*, 540 A.2d at 729.

The demand requirements of Rule 23.1 represent a procedural restatement of these bedrock principles of Delaware law of corporate governance in the context of *standing* to maintain a derivative shareholder's suit. *Tandycrafts, Inc. v. Initio Partners*, Del.Supr., 562 A.2d 1162, 1166 (1989). Rule 23.1's alternative requirements of pleading demand futility or wrongful refusal of demand are designed to strike a balance between a shareholder's claim of right to assert a derivative claim and a board of directors' duty to decide whether to invest the resources of the corporation in pursuit of the shareholder's claim of corporate wrong. *Spiegel*, 571 A.2d at 773; *Aronson*, 473 A.2d at 812. Both the requirements of demand futility and wrongful refusal of demand are predicated upon and "inextricably bound to issues of business judgment and the standards of that doctrine's applicability." *Aronson*, 473 A.2d at 812. Thus, the correct application of the business judgment rule is crucial to a determination of the sufficiency of a derivative complaint to withstand a Rule 23.1 motion in both a demand excused and a demand refused context.

### B

#### Standard of Review—Questions Presented

Our standard of review of the trial court's formulation of the legal standard controlling defendants' 23.1 motion to dismiss each of the derivative actions, *Grobow II* and *Levine*, is plenary or de novo. See, e.g., *Barkan v. Amsted Industries, Inc.*, Del.Supr., 567 A.2d 1279, 1284 (1989). Assuming no error in the formulation of the appropriate legal standard in each case, our standard of review of the application of the correct legal standard is for abuse of discretion. A decision on a Rule 23.1 motion, whether based on demand excused or demand refused, "involves essentially a discretionary ruling on a predominantly factu-

al issue." *Grobow I,* 539 A.2d at 186. *See also Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 624 (1984); *Aronson,* 473 A.2d at 814.

In *Grobow II,* three questions are presented, of which the first two are related. They are: (1) whether the Court of Chancery erred in granting plaintiffs relief under Rule 60(b) and leave to file a second amended complaint; and, if not, (2) whether the court, having granted such relief, erred in then confining its demand futility analysis to plaintiffs' claims based on newly discovered evidence. Assuming no error in those rulings, a further question is raised: (3) whether the trial court erred in dismissing plaintiffs' restated complaint for failure to plead particularized facts sufficient to excuse demand.

In *Levine,* four questions are presented: (1) whether plaintiff was entitled to limited discovery, as in *Zapata,* in response to defendants' Rule 23.1 motion; (2) whether the trial court applied the proper *pleading* standard for testing the sufficiency of Levine's Amended Complaint to withstand dismissal under Rule 23.1; (3) whether the trial court applied the correct *legal* standard for determining the sufficiency of a derivative complaint based on wrongful refusal of demand to withstand a Rule 23.1 motion; and (4) whether the plaintiff complied with Rule 23.1 by pleading particularized facts sufficient to create a reasonable doubt that the GM Board's refusal of Levine's demand was protected by the business judgment rule.

### III

### *The Grobow II Complaint*

### A

### *Plaintiffs' Claims of "Newly Discovered" Evidence*

In *Grobow II,* the first two questions enumerated above raise related issues. Therefore, we will take up both questions. They are: (1) whether the Court of Chancery erred in granting the plaintiffs leave to file a second amended complaint; and (2) if not, whether the court erred in confining its demand futility analysis to the Grobow Second Amended Complaint to plaintiffs' claims based on newly discovered evidence. Defendants assert that the Court of Chancery erred in granting plaintiffs leave to file a second amended complaint. Plaintiffs assert that the trial court erred in limiting its Rule 23.1 demand analysis to plaintiffs' newly discovered evidence claims. Both claims of error arise from the trial court's interlocutory order granting plaintiffs relief under Rule 60(b) and leave to file a second amended complaint based on plaintiffs' claim of "newly discovered evidence."

As previously noted, on May 16, 1988, two months after this Court's decision in *Grobow I,* plaintiffs filed motions in the Court of Chancery both to vacate the judgment in *Grobow I* dismissing plaintiffs' suits and for leave to file a second amended complaint. Plaintiffs' motions were filed under Court of Chancery Rules 60(b)(2) and Rule 15(a). Plaintiffs' "newly discovered evidence" consisted of: (1) the deposition testimony of two of GM's outside directors, James H. Evans and Thomas H. Wyman, obtained by the Grobow plaintiffs in May or June 1987, which was taken by other litigants in a related New York State court action;[1] and (2) disclosures of "important and relevant facts" contained in a book titled *Call Me Roger,* published in early 1988.[2]

In seeking Rule 60(b) relief, plaintiffs argued that the "newly discovered evidence" constituted material evidence that would satisfy the pleading requirements of Rule 23.1 for demand futility. That evidence was that GM's outside directors were misled about key provisions and consequences of the Perot buy-out and that the GM Board's approval of the buy-out was obtained in a hasty and ill-informed, and therefore grossly negligent, manner. Plaintiffs so alleged in a *proposed* Second

1. *Hart v. General Motors Corp.,* 129 A.D.2d 179, 517 N.Y.S.2d 490, *leave to appeal denied,* 70 N.Y.2d 608, 521 N.Y.S.2d 225, 515 N.E.2d 910 (1987).

2. Albert Lee, *Call Me Roger* (Contemporary Books 1988).

Amended Complaint, which *also* restated all of plaintiffs' original claims which had been pleaded in *Grobow I.*

On November 25, 1988, the trial court, over defendants' objections, granted plaintiffs relief under Rule 60(b) and leave to file the Second Amended Complaint. A dispute then arose between the parties over whether the court's order should simply "open" the *Grobow I* judgment, as defendants contended, or should "vacate" the judgment, as plaintiffs contended; and the court concluded that the "prudent course" was to "leave the issue undecided for the present, yet allow the litigation to proceed." [3]

Defendants contend that the Court of Chancery erred in granting plaintiffs leave to file the Second Amended Complaint. They base their argument for reversal primarily upon plaintiffs' concession that they had knowledge of the "newly discovered evidence" while they prosecuted their appeal of *Grobow I* before this Court. It appears to be undisputed that plaintiffs were in possession of most, if not all, of this evidence: at least one month before plaintiffs filed their opening brief on appeal in *Grobow I;* at least six months before oral argument before this Court in *Grobow I;* and at least nine months before this Court issued its decision in *Grobow I* on March 15, 1988. Defendants argue that plaintiffs' withholding of this evidence obviously reflected a "tactical decision" to await the outcome of *Grobow I,* and that plaintiffs' pursuit of their *Grobow I* appeal, without disclosing either to this Court or to the Court of Chancery this "newly discovered evidence," should bar plaintiffs' claim for Rule 60(b) relief.

The trial court rejected defendants' contention that plaintiffs' Rule 60(b) application was untimely because deliberately delayed to await the outcome of this Court's decision in *Grobow I.* The court reasoned:

If plaintiffs['] appeal had fully succeeded, then no Rule 60(b) motion would be

required. Even if the appeal were unsuccessful, an affirming opinion might provide useful guidance in any further proceedings in this case, as well as in future, cases. To hold that the plaintiffs were equitably compelled to forego their right to prosecute a Rule 60(b) motion as a condition to preserving their appellate remedy in this case, where the complaint had been dismissed at the very threshold and without discovery, would, in my opinion, be unreasonable and unfair.

Delaware law on standards governing the grant or denial of a Rule 60(b)(2) motion is well settled. An applicant seeking relief "from a final judgment, order or proceeding [on the grounds of] newly discovered evidence" must show that:

the newly discovered evidence has come to his knowledge since the trial; that it could not, in the exercise of reasonable diligence, have been discovered for use at the trial; that it is so material and relevant that it will probably change the result if a new trial is granted; that it is not merely cumulative or impeaching in character; and that it is reasonably possible that the evidence will be produced at the trial.

*In re Missouri–Kansas Pipe Line Co.,* Del. Supr., 2 A.2d 273, 278 (1938) (citations omitted). These standards have long been the law of Delaware. *See, e.g., Poole v. N.V. Deli Maatschappij,* Del.Ch., 257 A.2d 241, 243 (1969); *Kennedy v. Emerald Coal & Coke Co.,* Del.Supr., 42 A.2d 398, 404 (1944) (both cases quoting *In re Missouri* ). *But cf. Bachtle v. Bachtle,* Del.Supr., 494 A.2d 1253, 1255–56 (1985) (holding that in order to qualify as newly discovered evidence, the evidence must have been "in existence and hidden at the time of judgment") (quoting *Ryan v. United States Lines Co.,* 303 F.2d 430, 434 (2d Cir.1962)).

In granting plaintiffs relief from the judgment, the trial court ruled: "On the basis of the limited record before me, I

---

**3.** One year later, the trial court issued its decision on a Rule 23.1 motion as applied to the Second Amended Complaint. The court then realized that the lack of clarity of its order granting Rule 60(b) relief had led the parties to

take diametrically opposed positions as to what claims re-pleaded by plaintiffs would again be reviewed for purposes of demand excusal. Question (2), framed above, is the continuation of that dispute on appeal.

cannot conclude as a matter of law that the new evidence, as reflected in the proposed amended pleading, would not change the outcome on a renewed motion to dismiss under Rule 23.1." Defendants' cross-appeal of the ruling is not for error of law in applying the standards, but for abuse of discretion in not finding the relief time barred. Defendants assert that plaintiffs' tactical delay in presenting their new evidence to the trial court, or to this court while the appeal of *Grobow I* was pending, should bar recourse to Rule 60(b).

We disagree with the trial court's finding that plaintiffs acted "appropriately" in awaiting the outcome of this Court's decision in *Grobow I* before seeking Rule 60(b) relief. Plaintiffs' delay in seeking relief deviated from federal practice governing the disclosure of material evidence discovered pending an appeal. An appellant seeking relief from a judgment on the basis of newly discovered evidence should promptly apply for relief to the court which entered the judgment. "If the [trial] court indicates that it will allow the motion the [appellate court] should then be requested to remand the cause." *Egger v. Phillips*, 710 F.2d 292, 329 (7th Cir.1983) (quoting *Binks Mfg. Co. v. Ransburg Electro–Coating Corp.*, 281 F.2d 252, 260 (7th Cir.1960), *cert. dismissed*, 366 U.S. 211, 81 S.Ct. 1091, 6 L.Ed.2d 239 (1961)), *cert. denied*, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). *See also* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2873, at 263–66 (1973 & Supp.1990). While Delaware precedent is less well developed, it is no different. *Star Pub. Co. v. Martin*, Del. Supr., 95 A.2d 465, 468–69 (1953) ("If [the appellate court] reaches the conclusion that the judgment would probably be reversed in the lower court because of these newly found facts, the appellate court will remand."). *See Schmeusser v. Schmeusser*, Del.Supr., 559 A.2d 1294, 1296 (1989) (appeal stayed pending remand to trial court for determination of an issue not previously heard).

The likely result of a party's failure to promptly invoke a Rule 60(b) claim while an appeal is pending is that the appellate court may render an advisory opinion or decide an issue that is arguably moot or upon an outdated factual record. *Stroud v. Milliken Enterprises, Inc.*, Del.Supr., 552 A.2d 476, 480 (1989). "Whenever a court examines a matter where facts are not fully developed, it runs the risk not only of granting an incorrect judgment, but also of taking an inappropriate or premature step in the development of the law." *Id.* at 480. Judicial resources may not be squandered for academic exercises. *See id.* at 479–480.

While there is no time limit on the filing of a Rule 60(b) motion, *Swann v. Carey*, Del.Supr., 272 A.2d 711, 712 (1970), plaintiffs were under an obligation "to act without unreasonable delay." *Schremp v. Marvel*, Del.Supr., 405 A.2d 119, 120 (1979). The question becomes whether plaintiffs' apparent decision to await the outcome of *Grobow I* before seeking relief from the judgment below was so unreasonable as to foreclose relief. The court found plaintiffs to have pursued their appeal in good faith and not to have "behaved inequitably." Our standard of review of the question presented and the court's findings is not whether we would have reached the same result as the trial court, but whether the court's ruling is based on conscience and reason as opposed to capriciousness or arbitrariness. *Chavin v. Cope*, Del.Supr., 243 A.2d 694, 695 (1968); *Pitts v. White*, Del. Supr., 109 A.2d 786, 788 (1954). Applying this standard, we decline to find the trial court to have abused its discretion in granting plaintiffs leave to file a Second Amended Complaint.

■ We turn to plaintiffs' assertion that the trial court erred in confining its demand futility analysis of the Grobow Second Amended Complaint to plaintiffs' claims based on newly discovered evidence. Plaintiffs contend that the court erred as a matter of law and abused its discretion in refusing to reconsider their "newly developed" allegations of waste, self-interest and entrenchment as well as plaintiffs' newly stated claims that the GM outside directors failed to exercise due care. The premise for their contention is their construction of the record that the trial court's grant to plaintiffs of relief under Rule

60(b) for the purpose of filing a Second Amended Complaint was *unconditional.* Therefore, plaintiffs argue, their Second Amended Complaint had the legal effect of superseding and rendering null and void all prior pleadings, including the Rule 23.1 rulings of the trial court in *Grobow I,* and presumably of this Court as well. The Court of Chancery's asserted error was in failing to treat the entire Second Amended Complaint as a *tabula rasa,* which would require it to reapply its demand futility analysis under Rule 23.1 to all repleaded claims.

A court has broad authority, as well as discretion, in fashioning the terms of an order granting relief from judgment under Rule 60(b). 7 J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 60.19, at 60–166 (2d ed. 1990). Plaintiffs do not dispute this proposition. Instead, they contend that because the trial court's Rule 60(b) order granting plaintiffs relief and leave to file their amended complaint failed to include any conditions, they were entitled as a matter of law under the liberal precepts of Rule 15(a) to start afresh in amending their complaint.

We find plaintiffs' argument for converting a clearly discretionary matter into a claim of error of law specious and disingenuous. A court's broad discretionary authority to determine the scope of relief to be granted under Rule 60(b) clearly extends to the framing of the issues to be relitigated. The standard of abuse of discretion controls both a review of the trial court's grant of Rule 60(b) relief and the extent of the relief granted.

The record also rebuts plaintiffs' claim of surprise at the trial court's imposition of "retroactive conditions" on their new complaint by limiting the renewed issues of demand futility to the newly discovered evidence. The dispute over whether a case for grant of Rule 60(b) relief had been stated, as well as the breadth of the relief to be granted, extended over an eight month period. The record is also clear that the focus of the Rule 60 claim was the issues raised by the "newly discovered evidence." That is patently clear from the court's November 25, 1988 decision:

> The defendants first argue that the plaintiffs' new evidence does not constitute 'newly discovered evidence,' because it is not '... so material and relevant that it would probably change the result,' as required by Chancery Rule 60(b)(2).
>
> \*   \*   \*   \*   \*   \*
>
> On the basis of the limited record before me, I cannot conclude as a matter of law that the new evidence, as reflected in the proposed amended pleading, would not change the outcome on a renewed motion to dismiss under Rule 23.1. The deposition testimony of the two outside GM directors was taken in the *Hart* actions in May and June, 1987, *i.e.,* after this litigation had been dismissed. That testimony forms the basis of new allegations—not pleaded in the prior (dismissed) complaint—that GM's outside directors were misled about certain key provisions and consequences of the Perot buy out, and that GM's Board approved the buyout in a hasty, ill-informed, and therefore grossly negligent manner.

Plaintiffs' claim of surprise also cannot be squared with the parties' ensuing dispute over the appropriate form of order to be entered on the trial court's decision. Plaintiffs contended that the *Grobow I* judgment should be "vacated"; defendants argued that the judgment should, at most, be "opened." The court's decision to enter a form of order which left that issue "undecided for the present" belies plaintiffs' claim of surprise, unfairness and retroactivity in the court's ultimate decision to limit its demand futility analysis to the newly discovered evidence claims. The court's failure to resolve the issue a year earlier was, admittedly, a mistake. The court saw its mistake when plaintiffs first asserted their *"tabula rasa"* argument. The court then explicitly disavowed any earlier intent:

> to allow the plaintiffs to replead and reargue legal theories and arguments previously advanced, or to plead variants of those theories that could have been, but were not, previously alleged and ar-

gued, in connection with the earlier Rule 23.1 dismissal motion. Manifestly the plaintiffs could not have achieved that result if they had filed a new action, because they would have been barred by the doctrine of *res judicata*.

\* \* \* \* \* \*

Essentially the Court here granted the plaintiffs leave to file a new complaint, subject to the condition that only those claims that were based upon newly discovered evidence—the only rationale for granting Rule 60(b) relief at all—would be cognizable. To allow the plaintiffs to convert their newly amended complaint into a vehicle to reallege and reargue earlier pleaded claims or theories (or to assert theories or claims that could have been, but were not, alleged and argued at that earlier stage), would run counter to that rationale and defeat the very purpose for granting the Rule 60(b) remedy.

On this record the trial court cannot be fairly charged with imposing retroactive conditions on its grant of Rule 60(b) relief. We also find no merit to plaintiffs' contentions that the Court of Chancery abused its discretion in limiting its second demand futility analysis to plaintiffs' claims based on newly discovered evidence. Any other ruling would have been untenable, as it would have rendered two courts' reviews of plaintiffs' prior claims of demand futility, based on director self-interest, entrenchment and claims of waste, academic exercises, and rendered plaintiffs' efforts an abuse of the derivative process and Rule 60(b).

### B

### *Whether Plaintiffs' New Complaint Establishes Futility of Demand*

■ We take up the remaining question in *Grobow II:* whether the Court of Chancery correctly ruled that plaintiffs' claims based on newly discovered evidence were insufficient to establish the futility of a demand so as to require the dismissal of plaintiffs' Second Amended Complaint un-

der Rule 23.1. Court of Chancery Rule 23.1 provides, in pertinent part:

> The complaint [shall] ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and the reasons for his failure to obtain the action or for not making the effort.

As we stated at the outset (*see supra* II–A), the demand requirements of Rule 23.1 are predicated upon the application of the business judgment rule in the context of a board of directors' exercise of its managerial power over a derivative claim. In determining the sufficiency of a complaint to withstand dismissal under Rule 23.1 based on a claim of demand futility, the controlling legal standard is well established. The trial court is confronted with two related but distinct questions: (1) whether threshold presumptions of director disinterest or independence are rebutted by well-pleaded facts; and, if not, (2) whether the complaint pleads particularized facts sufficient to create a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment. *See Grobow I,* 539 A.2d at 187–188; *Aronson,* 473 A.2d at 814–815; *Zapata,* 430 A.2d at 782–784.

■ The premise of a shareholder claim of futility of demand is that a majority of the board of directors either has a financial interest in the challenged transaction or lacks independence or otherwise failed to exercise due care. *Grobow I,* 539 A.2d at 186, 188; *Aronson,* 473 A.2d at 814. On either showing, it may be inferred that the Board is *incapable* of exercising its power and authority to pursue the derivative claims directly. When lack of independence is charged, a plaintiff must show that the Board is either dominated by an officer or director who is the proponent of the challenged transaction or that the Board is so under his influence that its discretion is "sterilize[d]." *Zapata,* 430 A.2d at 784 (quoting *McKee v. Rogers,* Del. Ch., 156 A. 191, 193 (1931)); *Sohland v. Baker,* Del.Supr., 141 A. 277 (1927).

■ Assuming a plaintiff cannot prove that directors are interested or otherwise

not capable of exercising independent business judgment, a plaintiff in a demand futility case must plead particularized facts creating a reasonable doubt as to the "soundness" of the challenged transaction sufficient to rebut the presumption that the business judgment rule attaches to the transaction. The point is that in a claim of demand futility, there are two alternative hurdles, either of which a derivative shareholder complainant must overcome to successfully withstand a Rule 23.1 motion.

In addressing plaintiffs' restated claim of demand futility, the Vice Chancellor correctly limited his threshold analysis to the issue of director independence. We decline to revisit plaintiffs' repleaded allegation that the GM Directors, in approving the Perot buy-out, acted out of motives of entrenchment or financial self-interest. We also decline to reconsider plaintiffs' allegations that the buy-out represented a waste of corporate assets. We fully addressed those issues in *Grobow I*, 539 A.2d at 188–191; and, as we have already ruled, those issues were clearly not the basis upon which the Vice Chancellor premised the grant of Rule 60(b) relief.

Plaintiffs' remaining allegations, offered to sustain a claim of demand futility, are that the GM outside directors lacked independence because they were deceived or misled by management or inside directors concerning the true purpose of the Perot buy-out and the substantial progress that had been made in resolving the ongoing disputes between GM and EDS. Plaintiffs claim that the GM outside directors were so manipulated, misinformed and misled that they were subject to management's control and unable to exercise independent judgment. Plaintiffs assert that their restated complaint pleads with sufficient particularity the manner in which the GM outside directors, though they comprise the majority of the Board, were dominated and controlled by its management directors. As a result, plaintiffs allege that the outside directors' "independence was thereby destroyed and they were effectively dominated by the management directors." [4]

The Court of Chancery found that plaintiffs' restated claim of demand futility failed to plead particularized facts sufficient to create a reasonable doubt as to the independence of a majority of the GM Board. The court found that plaintiffs' claims based on newly discovered evidence implicated, at most, only two of GM's fourteen outside directors, thereby leaving at least twelve of the twenty-one directors (excluding Perot) independent and "capable of impartially considering a demand." The court also found any alleged deception concerning the placement of blame for the GM/EDS disputes immaterial to the fundamental decision of severing the GM–Perot relationship. Hence, the court found plaintiffs' Second Amended Complaint to have inadequately pleaded a claim of futility of demand.

**4.** The crux of plaintiffs' claim of demand excused is found in the following allegations of the Second Amended Complaint:

56. Demand upon the GM Board is excused. The approval by the GM Board of the Perot Buy Out was not approval by an independent or disinterested Board.

\*   \*   \*   \*   \*   \*

The outside directors knew or should have known that Smith and his fellow management directors had a direct personal and financial interest in seeing that Perot's objections were silenced because, if voiced and if convincing, Perot's objections could result in the loss of hundreds of thousands of dollars to the management directors.

57. The management directors' personal financial interest in maintaining their high salaries, bonuses and perquisites caused them to conceal material information from many of the outside directors, including members of the Oversight Committee, concerning the pivotal fact that the prior disputes between Perot and EDS over auditing, pricing and compensation were already substantially resolved. The outside directors had good reason to question and investigate the expressed justification for the Buy Out. Had they done so, they could have discovered that material facts were being concealed from them. Instead, members of the Oversight Committee and members of the full Board allowed themselves to be misinformed and uninformed as to the true reasons why management was recommending the Perot Buy Out. Their independence was thereby destroyed and they were effectively dominated by the management directors. As a result of the management directors' concealment and the outside directors' failure to exercise due care, the vote of the outside directors was no more than an unwitting ratification of management's self-interest.

Our standard of review of the Court of Chancery's finding that plaintiffs have not pleaded particularized facts sufficient to excuse demand is for abuse of discretion in the determination of a predominantly factual issue. *Grobow I*, 539 A.2d at 186; *Aronson*, 473 A.2d at 815. The demand requirement is not a "mere formalit[y] of litigation," but rather an important "stricture[ ] of substantive law." *Tandycrafts v. Initio Partners*, 562 A.2d at 1166. Plaintiffs' pleading burden under Rule 23.1 is also more onerous than that required to withstand a Rule 12(b)(6) motion to dismiss. *Grobow I*, 539 A.2d at 187 n. 6; *see also Allison on Behalf of General Motors Corp. v. General Motors Corp.*, 604 F.Supp. 1106, 1112 (D.Del.) (Rule 23.1 represents "a marked departure from the 'notice' pleading philosophy" governing the Federal Rules of Civil Procedure), *aff'd mem.*, 782 F.2d 1026 (3d Cir.1985). Conclusory "allegations of fact or law [which are] not supported by allegations of specific fact may not be taken as true." *Grobow I*, 539 A.2d at 187. On the other hand, plaintiffs are not required to plead evidence inasmuch as discovery is foreclosed. *Pogostin*, 480 A.2d at 625.

We affirm the Vice Chancellor's findings that plaintiffs have failed to meet their burden of adequately pleading a claim of demand futility based on lack of independence of GM's outside directors. The trial court's findings are supported by the record and cannot be found to constitute an abuse of discretion. Plaintiffs' conclusory allegations that the outside directors' independence was compromised by the inside directors' misleading, manipulative and deceptive conduct are unsupported by particularized facts. Such allegations of improper conduct by management are also inadequate to establish Board domination or control of GM's outside directors sufficient to find the latter lacking in "independence," in the customary definition of the term. *See Aronson*, 473 A.2d at 815–816; *Kaplan v. Centex Corp.*, Del.Ch., 284 A.2d 119, 123 (1971); *McKee v. Rogers*, 156 A. at 193. Plaintiffs' allegations detailed in paragraphs 56 and 57 of their restated complaint more appropriately relate to the issue of director due care and the business

judgment rule's application to the challenged transaction. Indeed, plaintiffs plead virtually the same averments for both purposes.

The question then becomes whether the restated Grobow complaint otherwise pleads particularized facts sufficient to rebut the presumption that the Perot buyback was the product of a valid exercise of business judgment. As we stated in *Spiegel*, the business judgment rule is "a presumption that in making a business decision, not involving self-interest, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Spiegel*, 571 A.2d at 774 (citing *Grobow I*, 539 A.2d at 187 and *Aronson*, 473 A.2d at 812). If a board's decision can be "attributed to any rational business purpose," *Sinclair Oil Corp. v. Levien*, Del.Supr., 280 A.2d 717, 720 (1971), a court will not substitute its judgment for that of a board. When the challenged transaction is approved by a board, the majority of whom are outside, nonmanagement directors, "a heavy burden falls on [plaintiffs] to avoid presuit demand." *Grobow I*, 539 A.2d at 190.

We have previously ruled that the Court of Chancery properly refused to reapply its demand futility analysis to plaintiffs' claims of director self-interest, entrenchment and waste. Thus, the trial court properly confined its remaining demand futility analysis to whether plaintiffs' restated complaint pleads particularized facts sufficient to create a reasonable doubt that GM's "outside" directors acted in such an uninformed manner as to constitute gross negligence.

Plaintiffs allege that GM's "outside" directors acwrd with such haste and were so misled by management as to reach an uninformed decision in approving the Perot buy-out. In *Grobow I*, we carefully addressed plaintiffs' original allegations of the GM Board's lack of procedural due care. *Grobow I*, 539 A.2d at 190–191. We reviewed the role of the GM "Special Review Committee," and we especially noted the absence of any allegations "that the GM directors, and in particular its outside directors, were dominated or controlled by

GM's management...." *Id.* at 191. In their restated complaint, plaintiffs delete reference to GM's Special Review Committee and the exclusive role played by GM's outside directors in reviewing the challenged transaction. Instead, plaintiffs now contend that a majority of GM's outside directors were uninformed because: (a) they were allegedly misled concerning the gravity of the disputes between senior management and Perot; and (b) the deposition testimony of two of GM's fourteen outside directors, Evans and Wyman (suggesting that they had misimpressions concerning the buy-out), is sufficient to defeat the presumption otherwise attached to an approval of a transaction by a board consisting of a majority of independent and disinterested directors.

We decline to find the Court of Chancery to have abused its discretion in finding plaintiffs' newly pleaded allegations insufficient to avoid presuit demand. We have previously found wanting plaintiffs' allegations that GM's outside directors lacked independence because they were manipulated, misinformed or misled by management. Under the circumstances of this case, these findings with respect to director independence have equal application to the issue of director due care. In summary, we agree with the Court of Chancery that plaintiffs' restated complaint fails to plead particularized facts sufficient to raise a reasonable doubt that a majority of the GM Board acted in so uninformed a manner as to fail to exercise due care.

## IV

### *The Levine Complaint*

#### A

#### *Whether Zapata Discovery is Compatible with Rule 23.1*

In *Levine*, the first issue we address is whether, in a demand refused case, a shareholder plaintiff suing derivatively is entitled to discovery prior to responding to a Rule 23.1 motion to dismiss. As previously noted, plaintiff Levine, shortly after filing suit in February 1987, initiated discovery of defendants by written interrogatories and requests for production of documents. Defendant then moved to dismiss the complaint under Rule 23.1 and sought a protective order barring discovery pending disposition of its motion to dismiss. Levine characterizes the discovery sought as "limited."[5] Following briefing and argument, the Court of Chancery, in December 1987, granted defendants' motion for a protective order staying discovery. The court held that a shareholder plaintiff, alleging that a pre-litigation demand has been wrongfully refused, is not entitled to discovery prior to responding to a Rule 23.1 motion to dismiss. The court ruled that a derivative plaintiff's standing to sue, whether suit is based on demand refused or demand excused, must be determined on the basis of the well-pleaded allegations of the complaint.

On appeal, Levine contends that the Court of Chancery erred as a matter of law in denying him "limited discovery" to substantiate his complaint's averments that his presuit demand on the GM Board was wrongfully refused. The decisional law on which Levine relies is limited to this Court's approval of discovery in *Zapata,* 430 A.2d at 788, and the federal district court's ruling in *In re Continental Illinois Securities Litigation,* 572 F.Supp. 928 (N.D.Ill.1983). *See also Kaplan v. Wyatt,* Del.Supr., 499 A.2d 1184, 1192 (1985).

Levine recognizes that *Zapata* was a "demand excused" case. He is also well aware of *Aronson*'s post-*Zapata* ruling that, unless a special committee of the

---

5. Levine presumably means that discovery would be limited to the issues to be determined in a Rule 23.1 proceeding, in this case the propriety of the GM Directors' refusal of Levine's demand. The discovery's purpose is a search for evidence to substantiate the Amended Complaint's allegations that GM's Board "did not consider plaintiff's demand with the due care and reasonable investigation required by their corporate office." However, plaintiff indicates that the scope of the requested discovery would include: the GM Board's "methods of inquiry ... in reviewing the demand"; the Board's "bases for its refusal" of the demand; and "the degree and nature of any 'interestedness' exhibited ... and/or lack of good faith evidenced by [GM's] directors [and] the thoroughness of their investigation."

board has moved to dismiss, the issue of demand futility must be determined on the basis of the shareholder's derivative complaint. *Aronson*, 473 A.2d at 813–14. Notwithstanding *Aronson*, Levine urges this Court to adopt the reasoning of the court in *Continental Illinois*, decided before *Aronson*, to extend the discovery permitted in *Zapata* to cases of demand refused. The court in *Continental Illinois* ruled that a derivative claimant in a demand refused case should be allowed limited discovery. The court reasoned that the burden of proof of the propriety of refusal should fall upon the board. 572 F.Supp. at 930. Levine also makes a "policy" argument: without discovery the Court of Chancery has "unjustly tilted the scales [in favor of the board] and permitted a corporate board to simply refuse a shareholder's demand for action with impunity." Finally, Levine argues that the burden of proof of the propriety of a refused demand should logically fall upon the defendant board. The board has "better access to the relevant facts" and, having raised the defense, the board should have "the burden of proving that defense." Dent, *The Power of Directors to Terminate Shareholder Litigation: The Death of the Derivative Suit?*, 75 Nw. U.L.Rev. 96 (1980).

The Court of Chancery's grant of the GM defendants' motion for a protective order is correct as a matter of law. The court's decision is as consistent with the premises underlying Rule 23.1 as *Continental* is inconsistent. *See supra* II–A; *Spiegel v. Buntrock*, 571 A.2d at 773–76. As we stated in *Spiegel:*

> Since a conscious decision by a board of directors to refrain from acting may be a valid exercise of business judgment, 'where demand on a board has been made and refused, [courts] apply the business judgment rule in reviewing the board's refusal to act pursuant to a stockholder's demand' to file a lawsuit. [*Aronson*, 473 A.2d] at 813.
>
> \* \* \* \* \* \*
>
> 'The burden is on the party challenging the decision to establish facts rebutting th[is] presumption.' *Aronson v. Lewis,*

473 A.2d at 812. Thus, the business judgment rule operates as a judicial acknowledgement of a board of directors' managerial prerogatives. *Id.*

\* \* \* \* \* \*

> The effect of a demand is to place control of the derivative litigation in the hands of the board of directors. *Zapata Corp. v. Maldonado,* 430 A.2d at 784–86. Consequently, stockholders who, like Spiegel, make a demand which is refused, subject the board's decision to judicial review according to the traditional business judgment rule. *Aronson v. Lewis,* 473 A.2d at 813; *Zapata Corp. v. Maldonado,* 430 A.2d at 784 n. 10.

*Spiegel,* 571 A.2d at 773–776 (footnote omitted).

The rationale for allowing discovery in a demand excused-*Zapata* context has no application in the case of either demand refused or demand excused, absent the *Zapata* context. The issue in *Zapata* was whether an impliedly interested board could delegate its power to dismiss a derivative suit to a special committee of outside disinterested directors. 430 A.2d at 786. This Court found that it could, if, among other things, the corporation could prove the Committee was independent, operated in good faith, and made a reasonable investigation. *Id.* at 788. As the court below pointed out, the act of establishing a special litigation committee constitutes an implicit concession by a board that its members are interested in the transaction and that its decisions are not entitled to the protection of the business judgment rule. *See Abbey v. Computer & Communications Technology Corp.,* Del.Ch., 457 A.2d 368, 374 (1983). However, as we stated in *Spiegel,* a board of directors concedes demand futility when it is both interested and establishes a special litigation committee to resolve the derivative plaintiff's suit. 571 A.2d at 777 (quoting *Abbey,* 457 A.2d at 373); *see also Aronson,* 473 A.2d at 814. Therefore, demand is excused and discovery is allowed. There is no basis for such presumptions to be extended to a demand refused case.

This Court's decision in *Aronson,* which followed *Continental Illinois,* demonstrates that the *Continental Illinois* court misapplied Delaware law, *see Aronson,* 473 A.2d at 813–14; and the federal court's subsequent decision in *Lewis v. Hilton,* 648 F.Supp. 725 (N.D.Ill.1986), recognizes *Aronson* as establishing the governing standard over discovery in a demand refused case as well as a demand excused case. *See Lewis,* 648 F.Supp. at 727–28 & n. 1. *Accord Allison v. General Motors,* 604 F.Supp. at 1119.

To hold as Levine suggests would be a complete abrogation of the principles underlying the pleading requirements of Rule 23.1. As previously noted, Rule 23.1 is an exception to the general notice pleading standard of the Rules. The Rule is a recognition of the board's duty to manage the business and affairs of the corporation. If discovery were permitted in demand refused cases, and not in demand excused cases other than in the *Zapata* situation, our careful distinctions between demand excused and demand refused would be upset by favoring the latter with limited discovery without first satisfying the pleading requirements of Rule 23.1.

### B

*The Derivative Shareholder's Pleading Burden in a Demand Refused Case*

We next address the question of whether the trial court applied the proper pleading standard in determining the sufficiency of the Levine complaint to withstand dismissal under Rule 23.1. At issue is the form of pleading and degree of particularity required for a complaint based on wrongful refusal of demand to be sustained. Levine makes two alternative arguments. First, he contends that, assuming the pleading standards controlling a claim of wrongful refusal of demand are those set forth in *Aronson* and *Grobow I,* the Court of Chancery committed legal error by applying to his complaint a pleading standard that was "heightened" and "far

more stringent" than that required by Rule 23.1, as interpreted in *Aronson* and *Grobow.* In the alternative, Levine argues that a more lenient pleading standard should be applied under Rule 23.1 to sustain a claim of wrongful refusal of demand which alleges "legally sufficient reasons" for questioning the validity of a board's exercise of its business judgment.[6] *See In re General Motors Class E Stock Buyout,* 694 F.Supp. at 1119; *Allison,* 604 F.Supp. at 1121.

In *Aronson,* this Court formulated the "reasonable doubt" pleading standard for determining the sufficiency of a complaint based on demand excused to withstand a Rule 23.1 motion. This Court stated:

> In our view demand can only be excused where facts are alleged with particularity which create a reasonable doubt that the directors' action was entitled to the protections of the business judgment rule.

> \* \* \* \* \* \*

> In sum the entire review is factual in nature. The Court of Chancery in the exercise of its sound discretion must be satisfied that a plaintiff has alleged facts with particularity which, taken as true, support a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment. Only in that context is demand excused.

*Aronson,* 473 A.2d at 808, 815. *Grobow I,* 539 A.2d at 186. Levine does not dispute the applicability of the *Aronson* reasonable doubt test to a claim of wrongful refusal of demand. The reasons underlying the adoption in *Aronson* of the "reasonable doubt" test to a claim of demand futility have equal application to standing of a derivative plaintiff to maintain a claim of wrongful refusal of demand. *See Spiegel v. Buntrock,* 571 A.2d at 773–775.

We think it clear from the record and the decision below that the court applied the "reasonable doubt" pleading standard to Levine's claim of wrongful refusal of demand. In addressing the issue of the ap-

---

**6.** Levine made a somewhat different argument before the Court of Chancery. Levine argued that the *Aronson–Grobow* pleading standard controlling a demand excused case should not apply in a "demand refused" case.

propriate pleading standard, the court stated, "The Rule 23.1 demand requirement, and the implementing form of judicial scrutiny required by *Aronson v. Lewis* and *Grobow v. Perot, supra,* are procedures to which this court must adhere in determining whether the board is so disabled." In properly rejecting plaintiff's contention that the court should apply the more lenient Rule 12(b)(6) "notice pleading" standard, the court reasoned that a notice form of pleading would "contravene the policy underlying Rule 23.1 and the clear mandate of *Aronson.*" It is patently clear that the court considered the reasonable doubt standard of *Aronson* as controlling its ultimate determination of the sufficiency of Levine's complaint under Rule 23.1.

■ Alternatively, Levine argues that a derivative complaint based on a claim of demand refused should be found to comply with Rule 23.1 when a plaintiff "alleges legally sufficient reasons to call into question the validity of the Board of Directors' exercise of business judgment." *Allison,* 604 F.Supp. at 1121. Levine overlooks the holding in *Allison* dismissing the complaint for its failure to meet the requirements of Federal Rule of Civil Procedure 23.1 of pleading facts with particularity. *Id.* at 1122. ("Plaintiff's paragraphs 6a and 6b of the amended complaint contain nothing more than bare conclusory allegations that the GM Board acted wrongfully in adopting the recommendation of the committee and rejecting the demand."). The court in *Allison* recognized that Rule 23.1 was a "marked departure from the 'notice' pleading philosophy of the Federal Rules of Civil Procedure," *id.* at 1112, for the reasons previously stated in III–B, *supra.*

Rule 23.1's command that a derivative complaint "allege with particularity the efforts ... made by the plaintiff to obtain the action he desires from the directors ... and the reasons for his failure to obtain the action ..." cannot be parsed to permit conclusory reasons alone to suffice. The requirements of particularity apply both to plaintiff's efforts to obtain the desired action and the reasons for failing to secure redress. *Allison* cannot be fairly read as

intending any departure from *Aronson*'s and *Grobow I*'s requirement of well-pleaded allegations of fact which create a reasonable doubt that a board of directors' decision is protected by the business judgment rule. *Grobow I,* 539 A.2d at 186, 187 ("well-pleaded allegations of fact must be accepted as true; conclusory allegations of fact or law not supported by allegations of specific fact may not be taken as true"); *Aronson,* 473 A.2d at 815.

We also find misplaced Levine's reliance upon *In re General Motors Class E Stock Buyout,* 694 F.Supp. at 1119, for a lesser pleading standard. We refer to the federal court's application of Delaware law to other GM derivative plaintiff suits challenging the Perot repurchase transaction and the GM Board's refusal of their demand for rescission. While the court recognized that "allowing general allegation[s] by a plaintiff would undermine the purposes of Rule 23.1" and that the burden of rebutting the presumption of the business judgment rule was upon plaintiffs, the court found plaintiffs to have met that burden with respect to the Board's decision to refuse their demand. *Id.* at 1133–34. The court found sufficiently particularized the complaint's conclusory allegations that the GM Board "neither reviewed its initial decision to approve the transaction nor made any inquiry in response to the demand letter. As alleged, the Board took no steps to obtain information prior to refusing the demand." *Id.* at 1134. These rulings appear to be premised on a serious misunderstanding of the controlling Delaware law.

The *In re General Motors Class E Stock Buyout* court has erroneously stated that the "reasonable doubt standard does not apply" to a claim of demand refused. *Id.* at 1132. The court also appears to have applied *Allison*'s erroneous *dicta* that a complaint which alleges "legally sufficient reasons" or conclusory allegations regarding refusal of demand is sufficient to rebut the business judgment presumption accorded a refusal of a demand. *See In re General Motors Class E Stock Buyout,* 694 F.Supp. at 1132. In our view, the *In re General Motors Class E Stock Buyout* court's Rule 23.1 ruling is flawed by its

assumption that a claim of wrongful refusal of demand is reviewed under a more lenient pleading standard than a claim based on futility of demand.

Finally, we must also reject defendant's contention that *Spiegel v. Buntrock*, 571 A.2d at 767, may be interpreted as implicitly permitting a pleading standard more stringent than "reasonable doubt" to be applied under Rule 23.1 to a derivative claim alleging wrongful refusal of a demand. Defendants assert that since the business judgment rule presumption attaches to the Board's refusal to rescind the challenged transaction, plaintiff Levine's complaint, to withstand dismissal under Rule 23.1, should be required to allege particularized facts sufficient to *rebut* the business judgment rule's attachment to the board's refusal of demand. Defendants misread *Spiegel*. *Spiegel* represents no departure from *Aronson* in the adoption and application of the reasonable doubt standard for determining the sufficiency of a complaint alleging wrongful refusal of demand to withstand dismissal under Rule 23.1. *Spiegel*, 571 A.2d at 773–776.

## C

### *The Legal Issues Controlling a Demand Refused Claim*

■ We next address the issue of whether the Court of Chancery applied the correct legal standard for determining the sufficiency of Levine's Amended Complaint to withstand defendant's Rule 23.1 motion to dismiss. The trial court ruled that the legal standard governing Rule 23.1 motions to dismiss "demand refused" cases is the same standard that governs dismissal of a "demand futility" case, that is, the *Aronson* two-part inquiry into board disinterest and independence as well as application of the tradition business judgment rule to the Board's refusal of the demand. The court thereby committed legal error.

■ The focus of a complaint alleging wrongful refusal of demand is different from the focus of a complaint alleging demand futility. The legal issues are different; therefore, the legal standards applied to the complaints are necessarily different. A shareholder plaintiff, by making demand upon a board before filing suit, "tacitly concedes the independence of a majority of the board to respond. Therefore, when a board refuses a demand, the only issues to be examined are the good faith and reasonableness of its investigation." *Spiegel*, 571 A.2d at 777. When a shareholder files a derivative suit asserting a claim of demand futility, hence demand excused, the basis for such a claim is that the board is (1) interested and not independent; and (2) that the transaction attacked is not protected by the business judgment rule. *Aronson*, 473 A.2d at 814. In contrast, Levine's complaint based on wrongful refusal of demand not only tacitly concedes lack of self-interest and independence of a majority of the Board, but expressly concedes both issues. Thus, the first part of the *Aronson* test did not come into play and the trial court was only required to address the application of the business judgment rule to the Board's refusal of Levine's demand.

## D

### *Whether the GM Board's Refusal of Levine's Demand was Wrongful*

■ We turn to Levine's final argument: that the Court of Chancery erred in finding his Amended Complaint to fail to allege particularized facts sufficient to overcome the business judgment rule presumption accorded the GM Board's refusal of his pre-suit demand. The standing of shareholder Levine to exercise "legal managerial power" and assert a derivative claim hinges upon his ability to establish that the GM Board's rejection of his demand was wrongful. *Zapata*, 430 A.2d at 784–85. As we stated in *Spiegel*, "[t]he effect of a demand is to place control of the derivative litigation in the hands of the board of directors"; and therefore, the board's refusal is subject to "judicial review according to the traditional business judgment rule." *Spiegel*, 571 A.2d at 775–76. Levine, by electing to make demand upon the GM Board before filing suit, tacitly conceded the independence of a majority

of the GM Board to respond to his demand. *Spiegel*, 571 A.2d at 777; *see supra* IV–C. Levine also does not challenge the GM Board's good faith in rejecting his demand. Therefore, under the traditional business judgment rule, the only issue remaining to be resolved is the reasonableness of the GM Board's investigation of Levine's demand. *Spiegel*, 571 A.2d at 777. Reasonableness implicates the business judgment rule's requirement of procedural due care; that is, whether the GM Board acted on an informed basis in rejecting Levine's demand. *See Grobow I*, 539 A.2d at 189–90; *Aronson*, 473 A.2d at 812–813.

Levine's complaint may be summarized as asserting essentially three allegations in support of his claim that the GM Board failed to exercise due care and to reach an informed business judgment in refusing his demand. Levine asserts: (1) that the Board declined to permit plaintiff's counsel to make an oral presentation to the Board concerning his demand; (2) that the Board failed to undertake any investigation of his demand for rescission of the Perot buy-out; and (3) that GM's Board "did nothing" following receipt of his demand.[7] Levine contends that these allegations are sufficient to create a reasonable doubt that the GM Board acted in an informed manner in refusing Levine's demand.[8]

The Court of Chancery, in a carefully considered decision, found Levine's allegations insufficient to create a reasonable doubt that the GM Board's rejection of his demand was the product of an informed business judgment. The Court ruled that Levine's complaint failed to plead particularized facts sufficient to create a reasonable doubt that the GM Board acted in an informed manner in rejecting Levine's demand. On appeal, Levine argues, as he did below, that he has complied with Court of Chancery Rule 23.1 by sufficiently pleading that the GM Board's refusal of his demand "for action with regard to GM's hushmail payment to Perot" was an uninformed decision and therefore wrongful.

**7.** We refer to the following allegations of Levine's Amended Complaint:

66. The Board's refusal to move forward with the action set forth in plaintiff's demand was wrongful because the Board's original decision to purchase Perot's stock ... was made without proper investigation and was an uninformed decision.

\*   \*   \*   \*   \*   \*

79. Not only was the rationale for the buy-out an improper exercise of business judgment, the reasons and problems which the GM Board of Directors stated as the cause for the buy-out had been rectified prior to the buy-out. Therefore, the Board's decision was uninformed and improper, and their refusal to undertake action pursuant to plaintiff's demand was wrongful, and is not protected as a valid business judgment.

\*   \*   \*   \*   \*   \*

100. In compounding their failure to make properly informed business decisions, GM's Board of Directors, upon receiving plaintiff's demand for action on December 11, 1987, did nothing. The GM Board of Directors disregarded the duties and did not undertake an investigation, which would have uncovered the above detailed discrepancies and falsehoods underlying their original decision regarding the Perot buy-out. The GM Board merely met at their regularly scheduled January meeting and denied plaintiff's request for action.

101. As previously asserted, the Board of Directors has colluded in the self-motivated buyout of Mr. Perot. The Board's refusal to permit plaintiff's counsel to make a presentation at the Board meeting further indicated that the Board would not actually consider rescinding the buyout. Once again the Board's intolerance to criticism has injured the Company. The Board's actions show that the Board was predisposed to refuse plaintiff's demand for action, without giving plaintiff's demand the slightest actual consideration. Indeed, on December 2, 1986, *The Wall Street Journal* quoted James H. Evans, Chairman of GM's Audit Committee, as stating: "The directors have 'no intention of rescinding the agreement.'" Therefore, in addition to all of the previously detailed breaches of their duties, GM's Board of Directors did not consider plaintiff's demand with the due care and reasonable investigation required by their corporate office.

**8.** Levine's December 11, 1986 letter to GM's Board demanded GM to "take prompt action to rescind the buy-back of GM series "E" stock" from Perot and his close associates. The letter stated in part, "Our client regards these payments to Mr. Perot as a waste of corporate assets." The letter also attacked the provisions of the agreement that Perot desist from further criticism of GM and its management and demanded that the contract entered into between GM, Perot and his associates be rescinded by December 15. By letter dated December 15, GM responded that Levine's demand would be considered by the GM Board of Directors at its next regularly scheduled meeting on January 5, 1987.

This Court's standard of review of a Court of Chancery ruling upon the sufficiency of a derivative complaint to plead a claim of wrongful refusal of demand is no different than review of a claim premised upon demand futility. We will reverse a Court of Chancery Rule 23.1 ruling "only on a showing of abuse of discretion, assuming no legal error led to an erroneous holding." *Grobow I*, 539 A.2d at 186; *Pogostin*, 480 A.2d at 624. We have previously determined that the Court of Chancery applied the proper "reasonable doubt" pleading standard to Levine's claim of wrongful refusal of demand; and the parties' only dispute is whether the trial court has properly construed the complaint as insufficient to raise a reasonable doubt that the GM Board acted in an informed manner. Thus, our standard of review of the trial court's finding on the issue is for abuse of discretion in the context of a "predominantly factual" question. *Grobow I*, 539 A.2d at 186.

While a board of directors has a duty to act on an informed basis in responding to a demand such as Levine's, there is obviously no prescribed procedure that a board must follow. We find no abuse of discretion in the Vice Chancellor's rejection of Levine's contention that the GM Board's failure to permit Levine to make an "oral presentation" to the Board evidenced a lack of due care or unreasonable conduct. Indeed, the court found the argument insufficient as a matter of law, stating:

> A board of directors is not legally obligated to permit a demanding shareholder to make an oral presentation at a meeting. Corporate directors normally have only limited available time to deliberate, and a determination of what matters will (and will not) be considered must necessarily fall within the board's discretion. *See* Manning, *The Business Judgment Rule and the Director's Duty of Atten-*

*tion*, 39 Bus.Law. 1477, 1485 (1984). A ruling that, as a practical matter, would require GM's Board to hear the plaintiff's oral presentation, would place directors in the untenable position of having to entertain presentations by any shareholder who threatens to file a derivative action. It would also be an unwarranted intrusion upon the board's authority to govern the corporation's affairs conferred by 8 *Del.C.* § 141.

We fully agree.

Plaintiff's remaining allegations, that GM's Board, after receiving Levine's demand letter "did not undertake an investigation" and "did nothing," represent conclusory allegations that are in fact contrary to the pleading record. Levine's allegation that the Board "did nothing" is contradicted by the Board's letter of reply rejecting Levine's demand. The letter, attached to plaintiff's Amended Complaint, states, "following review of the matters set forth in your December 11, 1986 letter, the Board ... unanimously determined that an attempt to rescind, or litigation ... concerning [the repurchase agreement] is not in the best interests of the Corporation." As the trial court points out, GM's letter reply "is inconsistent with, and thus diminishes the force of, plaintiff's allegation that the Board 'did nothing.'" Further, the Board's letter response refusing Levine's demand "following review of the matters" which were the subject of Levine's demand letter of December 11, 1986 reflects on its face the GM Board's consideration of Levine's demand.[9] The only reasonable inference to be drawn from this document is that the GM Directors did act in an informed manner in addressing Levine's demand. The business judgment rule accords directors the presumption that they acted on an informed basis. *Grobow I*, 539 A.2d at 187. The trial court was clearly correct in dismissing Levine's Amended Complaint

---

**9.** GM's January 9, 1987 reply letter states as follows:

Please be advised that on January 5, 1987, following review of the matters set forth in your December 11, 1986 letter, the Board of Directors of General Motors Corporation unanimously determined that an attempt to rescind, or litiga-

tion, or other action concerning the transaction involving the purchase of General Motors Class E stock and related contingent notes from H. Ross Perot, Morton Meyerson, William Gayden and Thomas Walter is not in the best interests of the Corporation. Accordingly, the board refused your demands.

for failure to plead particularized facts sufficient to create a reasonable doubt that the GM Board's rejection of Levine's demand was wrongful because reached in an uninformed manner.

\* \* \*

The decision of the Court of Chancery in Appeal No. 39, 1990 is affirmed.

The decision of the Court of Chancery in Appeal No. 518, 1989 is affirmed.